The case on for argument is Ultegra LLC and Cipriani v. Mystic Fire Department et al. Mr. Raymond, good morning. Your Honor, in this case, we're Just ask you one question, because I didn't. Maybe it's clear in the record and I missed it. Is this a sub-row claim? It is not, Your Honor. The house in question was not insured. So my client in this case is here to preserve her remedy. So as the Court is familiar with the underlying facts of this case, we're asking this Court to reverse the lower court in order that my client's opportunity for a fair trial and justice may be preserved. The property in question, Your Honor, 23 Liberty Street, Mystic, Connecticut, was not just a home. It was my client's, Ms. Cipriani's, life's work and her art. She was an engineer in the building trades. This house represented many years of work, material selection. She was on the roof hammering the copper fittings. She was selecting the exotic woods for the home, and it was in the course of construction. On the day of the fire, there was no power to the house, there was no one living in it, and that's the reason why there was no insurance on the property at the time. The facts here, Your Honors, are nothing short of outrageous. The fire department, which is the public safety body chargeable to protect the public from fires, from the effects of arson, was in fact responsible for burning Ms. Cipriani's house to the ground. That's going a little too far, I think, Mr. Raymond. How did those in charge of the fire department have any knowledge that Mr. Seltruda, that's  Yes, Your Honor. The individual in question was operating totally off the reservation and certainly, I am sure, did not comply with the rules and regs of the Mystic Fire Department. That's correct, Your Honor. I would point out, however, that the party that set the fire, it's undisputed, was a member of the fire department. Yeah, but he wasn't acting as a member of the fire department. So why don't you and I not debate this. Let's talk about how the fire department is somehow liable for what he did. Yes, Your Honor. And procedurally, what we point to as the most persuasive fact for overturning the trial court was the fact that the court found that in the complaint, although it alleged that the defendants failed to conduct psychological screening. The court, that was in the complaint and the record is, there's no question about that. However, the trial judge, we believe, too narrowly construed the complaint to find that since there was no specific mention of drug and alcohol screening in the complaint, that the defendants in the case were not on fair notice of the nature of the claims. However, at the time, not only was it specifically pled in the complaint that failure, the manner in which the fire department screwed up and should be liable, was the fact that they did not follow their own bylaws in the screening, they did not follow the standard of care, which our expert was prepared to testify, should have included certainly psychological screening and any component thereof that was targeted towards drug and alcohol screening. In this case, the fire department had some bylaws. Before somebody comes onto the firehouse, there's supposed to be a rigorous investigation of the qualities and character of the individual. There was, according to the written by-rules, there was supposed to be a committee of three that investigated the proprietary. The whole purpose of the rule is to protect the public from criminal, from persons such as persons with a criminal background with drug and alcohol problems. But for the fire department's failure to follow its own procedure, had they done so, they would have discovered that there were pending criminal actions against the individual that committed the arson. Further, that there was a history of drug and alcohol problems. Is there any evidence they had actual knowledge of this information? Well, Your Honor, in terms of actual knowledge, they had knowledge that there was drinking at the firehouse, there was, the firehouse funds were used to purchase kegs of beer. As to Seltruda, though? As to Seltruda, at the time of the incident, he was living with his grandfather. His grandfather was one of the members of the firehouse. The other person besides Mr. May, who was the principal party and the senior officer in charge of the investigation, he elected to include only one other in the investigation process. And the person he selected was, in fact— Is there any evidence that May had knowledge of this prior drug use of Seltruda? No, Your Honor. There's no direct evidence that there was a paper in the file or a statement to Mr. May about this particular matter and problem. However, the records did exist, and any basic psychological screening would include examination for drug and alcohol problems and also testing. So at the outset— Did you have to meet the shock to conscience test here for Ducheney? I think, Your Honor, here there were, there was a series of claims— Am I right about that? That's the standard, though, for this kind of a claim? In terms— Shame, outrageous, shock to conscience behavior. I think gross negligence and deliberate indifference is the phrasing, but, yes, I would agree with the Court's general characterization. As it goes to the Section 1983 claim, we have ordinary— How do you tag May with that? I'm sorry? How do you tag May? Well, here's what happened. They threw May through the procedures and rules over his shoulder at the time, and didn't conduct any investigation whatsoever. In fact, instead of an investigation committee, it would be more accurate to describe it as a hiring committee. There was no investigation or screening that was conducted, and what the plaintiff had was a standard of care expert, Mr. Murphy, who had proffered an opinion. So getting back to the reason that got us here, the Court excluded the proffered evidence of the alcohol and drug problems and also unduly restricted the standard of care expert who was going to testify about how rampant a problem it is that arsonists seek to employment in fire departments such as this to be around fire, and there is a basic screening function that was not deployed here. So although we don't show actual knowledge, we do show gross negligence. We do show reckless disregard for the safety of the public. I'm referring to this as a 1983 action. Well, Your Honor, the... Why aren't you in Connecticut State Court, you know, running this up and down the flagpole in front of a Connecticut State judge who may apply Connecticut law to what the standard of care is for the operation of a fire department? Because the danger in question was a state-created danger, Your Honor. These are hired by the public officials. Is that claim unavailable to you in the state of Connecticut? I can't imagine that. No, Your Honor. The case could proceed as a negligence case, and in fact... Which is what it is, isn't it? It certainly includes that. We also submit respectfully to the state... You out of time to bring that in Connecticut? I'm sorry, Your Honor? Are you out of time to bring that in Connecticut? The negligence case was included, Your Honor, and in fact, that goes to... I know it's included here. Are you out of time to bring that in Connecticut State Court if this court, if the federal court doesn't have jurisdiction? Yes, Your Honor. It may be without a remedy, but it may not be the Mystic Fire Department. Well, Your Honor, we would respectfully submit that a fair and just trial according to the rules is what's required. The fact that the judge read the complaint, which included a specific allegation of psychological screening. So for the court to have concluded that this issue was not even before the court... Psychological screening doesn't mean drug testing, at least where I'm from. Your Honor, our expert would have testified that psychological screening does include questions about substance abuse and drug testing. He would have testified that based on what's been learned in the area of fire science about the dangers of a person such as Mr. Soltruda seeking employment in the fire department. Also, they had the procedures in place, which had they followed them, but for their failure to follow these procedures, Mr. Soltruda would never have been employed there and thus not in a position to have created the harm. Your Honor, there was ample evidence available that unlike a fire department, this was more like a frat house or a drinking club. So this wasn't an isolated incident. There was evidence that the fire department regularly drank on the premises. Our facts are unique also, Your Honor, in that there was an actual fire that was started at the firehouse by Soltruda with knowledge of at least one other person in the department in the short window where the department had an opportunity to prevent the harm which occurred. That was that night though, wasn't it? It was earlier in that night and followed into the morning. So it was at the firehouse. So when we look at the cases that have addressed similar circumstances, including the Pena County case, which this court looked at similar conduct where a police officer had been drinking during the day and those others had noticed that he had been drinking, it was found that that conduct was sufficient to state a case under the circumstances. Also there is an identifiable class of persons. This person was going to go within the fire district, which is in fact what occurred. So there was one fire that was set under the same conditions in the fire district, and then later, within hours, there was the second fire at issue, which resulted in it burning down. Thanks, Mr. Raymond. You've reserved a minute for rebuttal. We'll hear from Mr. Deacon. Thank you, Your Honor. Good morning. May it please the Court. Michael Deacon on behalf of the appellees. District Judge Shea's discretionary ruling under 401 and 403 precluding the introduction of drug use by William Seltruda was correct, and even if it wasn't correct, it was not within its discretion arbitrary or irrational. I would point the Court out to the appendix at pages 313 through Judge Shea's decision on the record regarding this very issue. Judge Shea, faced with the appellee's then defendant's motion to preclude Mr. Seltruda's drug use, inquired of plaintiff's counsel, not Mr. Raymond, trial counsel, at length regarding what his proof was on relevance and prejudice of this drug use. Did he rule on the basis of 403? Didn't he conclude that at the end of his ruling, too? Both that it was not relevant, and even if relevant, its prejudice outweighed its probative effect. That ruling is absolutely correct, given the facts of this case. My brother counsel has indicated he hasn't had a chance for a remedy. He had a jury trial in this case, and he lost. He lost on his claim that Lieutenant May did not properly screen Mr. Seltruda under the bylaws of the company. A jury heard that, and he lost it. And he also lost his case against Lieutenant Hilbert, who was the person, unfortunately, who drank with Mr. Seltruda on July 25, 2008. And he brought those negligence claims, wanton and reckless claims, against the lieutenant, and he lost them. The only issue before this Court that could possibly reverse this, and counsel seeks reversal of it, is that Mr. Seltruda's drug use, unknown to Mr. May, which Judge Shea inquired about and plaintiff's counsel conceded, unknown to everyone at the fire department, and not required under the bylaws to conduct such a test, somehow should have been admissible. And district — So what do you say to his argument, which he's certainly advocated quite forcefully here, that the psychological background testing by — in and of itself would have included some drug analysis? Well, and counsel's pointed out that Judge Shea did acknowledge, because we raised it, that it wasn't listed or described or alleged in the complaint. Right. And we're understanding. It's really here nor there. Judge Shea addressed it and said it's not alleged, but the bylaws didn't even require drug and alcohol testing. It was speculative as to whether or not if the standard of care at the time, and their expert got to testify on the standard of care, the jury rejected that testimony and found in favor of the defendants and 45 minutes of deliberations. All of those issues were before the court. What Judge Shea, I think, appropriately analyzed and was quite careful of was that the plaintiff's lawyer wanted to get some general use, drug use in front of the jury, a bad act, even though it played no role in the admission of this officer on a probationary basis. This firefighter was only a probationary member for two months before July 25th and the drinking incident. Judge Shea was — made sure to question, was there any evidence that Mr. Seltruda had engaged in conduct during that two-month period that it would have alerted anyone at the firehouse, Lieutenant Hilbert or Captain May, to his drug use? And the answer to that is no. There was simply no evidence of that. So it's really a claim, a very narrow discretionary claim that was, in our eyes, obviously we believe correct. And even if it wasn't in the eyes of this Court, it wasn't arbitrary or irrational. And if you look at the pages of the appendix where Judge Shea is very careful to go through the analysis of what's a fairly straightforward evidentiary issue. Can I ask you about the valuation issue, the real estate appraisal issue? Sure. Judge Shea ruled that the two appraisers had used the wrong method of evaluating the damaged property. But was there evidence presented of its value at the trial in a different way? There was. What was that? The evidence was done by an appraiser, Mr. Silverstein, who appraised the property at approximately $1.5 million under methods approved and authorized by USPAP, the Appraisers Association. Mr. Benedict, he's been criticized in Connecticut in a number of cases regarding what is essentially a faux appraisal of sales comparisons, the sales comparisons approach. He, Mr. Silverstein, who had previously appraised, and this was heard by the jury, in a tax appeal two years before Mrs. Cipperini's house burned down, Mr. Silverstein appraised the property for tax purposes at $310,000. He then testified at trial after he used the sales method at trial? Yes. Was the replacement cost, I think, that Judge Shea had the problem with the other two appraisers, right? He had a replacement cost with expert Woodward. He excluded that under Connecticut case law, that it's the diminution in value based on the sales comparison approach. And then as to Benedict, who was offered initially as a sales comparison approach, he said that's not acceptable or a reliable approach because he was comparing properties, Mrs. Cipperini's property in Mystic, Connecticut. The highest price ever paid for a property in Mystic, Connecticut is $1.7 million. Mr. Benedict, through his own creative appraisal approach, was looking at homes in Greenwich and Westchester County and White Plains worth $10 million. And he simply said, well, this is kind of like those houses, and under my theory it's worth $10 million. Judge Shea said that's not reliable, you're not following the regulations under the appraisal. So to answer your question, after, which is another issue regarding the sanctions that were awarded in my client's favor against Mrs. Cipperini, based on her continuance request done on the eve of trial, after her experts had been precluded, she immediately filed a motion for continuance, and Judge Shea allowed her to disclose Silverstein so long as they paid for it. And he testified that it was worth $1.5 million. So Mrs. Cipperini has had her day in court, in front of a jury, in Connecticut, in front of her citizens, and she lost. The only issue is, should Judge Shea have allowed the drug use of Mr. Seltruda that no one at the club, it's admitted at the club, excuse me, at the firehouse, knew about. And the subsidiary issue or the follow-on issue is if she, if he should have allowed it, would it have made a difference? Exactly, Your Honor. So unless the Court has any other questions, I will rely on the brief with respect to the sanctions issue and the continuance request, which, again, demonstrates Judge Shea's very careful analysis in some doctor's notes that Ms. Cipperini presented to the Court, which were directly contradicted by videotape of her speaking in front of a town council meeting at a time she claimed to the district court she was simply unable to attend a trial, could not eat, could not travel, could not sit. The videotapes depict something dramatically different. And out of sanctions, some of which we didn't even request. You didn't cross-appeal with respect to the award with respect to the sanctions? No. Thank you very much, Your Honor. Let me just ask on sanctions. There are no findings as to bad faith, is that right? Judge Shea made sure to say, I am not finding that Ms. Cipperini intentionally misled the Court, but he indicated that his questioning and one of his questions after, after Ms. Cipperini's experts were precluded, the continuance was immediately filed. She had no experts on damages at that point in time. But is that sort of inference of bad faith with an express statement of non-bad faith sufficient for either inherent power sanctions or Rule 11 sanctions without an opportunity to, I mean, in the Rule 11 context, there's, I'm not sure what would be withdrawn here, but typically you're given an opportunity to remedy in the face of, in the face of notice of the sanctions. There was an order to show cause here. And Judge Shea was careful to put down, these are the four. I want Mrs. Cipperini to address the defendant's concerns regarding what appeared to him to be misrepresentations to the Court regarding her health based on his view of those videotapes. And then he wrote, the plaintiff, Ms. Cipperini, should address whether the case should be dismissed, experts should be precluded, sanctions should be, and Judge Shea gave the least possible sanction. The dollars it took my firm to draw up a motion regarding the videotapes of $3,450. He took the least arduous way out and allowed her still to disclose an expert witness, even though he found that he had been given a misperception. Right. So I don't think there's really. There had been continuances that did result from that and presumably some trials close to the eve of trial. Am I understanding that correctly? The initial trial in front of Judge Shea in September of 2013, the first motion for continuance was filed the day after we filed our joint trial memorandum and the motions to preclude the experts. You were essentially on the eve of trial. Absolutely, Your Honor. And then that pushed off. Right. But Judge Shea agreed to hear our motions to preclude Benedict and Woodward on the damages issues. He then, given her health condition, ruled on those and precluded them. And those were coming down the pipe, and Ms. Cipperini knew that. But Judge Shea is sanctioned to $3,450. I've never had a sanction order in my favor in my 25-year career. It was a mild order, given his belief that there had been a misimpression regarding her health. Thank you very much, Your Honors. Thank you. Thank you, Mr. Deegan. And, Mr. Raymond, you have reserved a minute for rebuttal. Yes, Your Honor.  Just very briefly on the issue of the sanctions, I would highlight for the Court that before someone is sanctioned, it should be a clear and unambiguous order. Ms. Cipperini submitted medical evidence from her doctor, which was uncontroverted in the record, that she was not available to participate in half- or full-day hearings at the time, and despite being faced with an uncontroverted medical opinion, elected to issue the sanctions. So I think that the record is quite clear that the sanctions were inappropriate. With regard to the measure of damages, very briefly, if you build a house out of gold, the comparables, if there isn't a comparable property to be had, then there are other methods recognized under Connecticut law. In this case, the proffered testimony as to the damages, this was a house that had such unique characteristics, such as hand-selected South American woods, hand-hammered, fittings and features that weren't there. It wasn't just a house. It, in essence, was a work of art, and that the comparables, in the absence of comparables, the replacement value or cost method would be appropriate. Although, Your Honor, it's correct to the main issue, really, is the Court. It's clear on the record where the duty required the judge to broadly construe the complaint. It's clear that when you look at what was in the complaint, the psychological screening, any level of psychological screening has inquiry of drugs, crimes, and alcohol. Alcohol is a drug, and in the mental health profession, there's no meaningful distinction between the effects of alcohol and drugs. Thank you very much, Mr. Raymond. We have your points. Thank you. And thank you both. We'll reserve decision.